U.S. District Court
District of Connecticut
FILED AT NEW HAVEN

April 5 ____ 20 24

By ___ S. Santos ___
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR A SEARCH WARRANT

Case No. 3:24-MJ-_320_ (MEG)

April 5, 2024

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR
### A SEARCH WARRANT UNDER FED. R. CRIM. P. 41

I, Nathaniel May, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being first duly sworn, herby depose and state as follows:

### INTRODUCTION

1.     I submit this affidavit in support of a search warrant for two (2) cellular telephones, one of which has been in law enforcement possession since its seizure on or about March 20, 2024 (hereinafter referred to as "**Target Telephone-1**"). The other cellular telephone is believed to be in the possession of the target's father (hereinafter referred to as "**Target Telephone-2**".)  The cellular telephones are described in Attachment A, incorporated herein, and as follows:

  a.     **Target Telephone-1**: One iPhone in a clear phone case believed to be associated with the telephone number (860) 508-8947; and

  b.     **Target Telephone-2**: One suspected iPhone believed to be associated with the telephone number (959) 221-6821.

  (Collectively, the "**Target Telephones**.")

2.     I respectfully submit that there is probable cause to believe that the **Target Telephones** will contain evidence that Andrew PAYNE (DOB: XX/XX/1984, hereinafter "PAYNE") did commit violations of 18 U.S.C. § 922(g)(3) (unlawful possession of firearms and ammunition by user of a controlled substance) and 26 U.S.C. § 5861(f) (illegal manufacturing of

1

National Firearms Act regulated firearms) (hereinafter, the "Target Offenses").

## BACKGROUND

3.      I am a Special Agent employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  As such, I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code; that is, an officer empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Section 2516 of Title 18.  I have been employed by ATF since August 2020.  Prior to my employment with ATF, I worked as a licensed professional fire protection engineer for two years. I graduated from the University of Maryland in 2015 and 2017 with Bachelor of Science and Master of Science Degrees in Fire Protection Engineering. I have completed the Criminal Investigator Training Program (CITP) and the ATF Special Agent Basic Training program (SABT), both of which were conducted at the Federal Law Enforcement Training Center (FLETC) in Glynn County, Georgia. I have received specialized training in firearms identification and the investigation of firearms-related offenses.

4.      I have participated in investigations involving the unlawful possession of firearms by prohibited persons, including persons who are previously convicted felons and users of controlled substances; the possession of firearms in furtherance of the distribution of drugs; and the use of firearms in the commission of violent acts.  I have participated in investigations involving individuals who unlawfully possess firearms, of individuals illegally manufacturing firearms, of individuals illegally selling firearms, and of individuals distributing illegal drugs.  As such, I have coordinated the controlled purchases of drugs utilizing confidential sources and undercover law enforcement officers; written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the illegal possession and distribution of

firearms and drugs; conducted surveillance of individuals involved in illegal firearm and drug distribution; analyzed records documenting the purchase and sale of firearms and illegal drugs; and spoke with informants and subjects, as well as local, state and federal law enforcement officers, regarding the manner in which individuals obtain, finance, store, manufacture, transport, and distribute illegal firearms and drugs.  I have received training, both formal and on-the-job, in the provisions of the federal firearms and drug laws administered under Titles 18, 21 and 26 of the United States Code.

## PROBABLE CAUSE

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6.      I am currently assigned to the ATF Hartford Field Office.  I have been investigating the possession of firearms and ammunition, by Andrew PAYNE ("PAYNE"), YOB 1984, for whom there is probable cause to believe, and I do believe, possessed firearms and ammunition while being a a user of illegal substances, as well as illegally manufactured National Firearms Act ("NFA") regulated firearms.  I believe that evidence of these violations is contained within Target Telephone-1 and Target Telephone-2.

## INVESTIGATION

### *Events of March 16-27, 2023*

7.      At the end of 2021, ATF investigators in the Saint Paul Field Division opened an investigation into "FullAutoSwitch@gmail.com" for suspected trafficking of National Firearms Act ("NFA") regulated firearms, namely machinegun conversion devices ("MCD").  In March

2023, the ATF Hartford Field Office received a recovery referral into the possible possession of MCDs by PAYNE.  The referral indicated that PAYNE was identified as a possible recipient of MCDs based on information gained during their investigation.  PAYNE was believed to have purchased, between December 31, 2020, and July 2, 2021, thirteen (13) suspected MCDs over eight (8) different purchases, for a total of $1,300.00.  The devices PAYNE was believed to have purchased appeared to be drop in auto-sears for AR-style firearms, "Glock Switches," and "Lightning Links," all devices ATF had previously determined were designed to convert semi-automatic firearms into automatic firearms.  ATF considers these MCDs to meet the federal legal definition of a machinegun.

8.      On March 16, 2023, ATF investigators attempted to make contact with PAYNE at his residence on Sturgeon River Road in Glastonbury, Connecticut.  PAYNE was not home, and investigators left a business card.  Investigators later received a call from PAYNE's attorney, an individual with initials M.G., who arranged for investigators to meet at PAYNE's residence.

9.      On March 20, 2023, ATF investigators met with PAYNE at his residence. PAYNE's attorney, M.G., was also present.  Investigators explained to PAYNE why they were there and that the devices they believed he purchased had been determined by the ATF to be machineguns and were thus illegal to possess.  PAYNE told investigators that he could not recall who or where he had purchased the devices from.   When provided the email address "FullAutoSwitch@gmail.com," PAYNE was able to search his email via his mobile telephone and find receipts from "FullAutoSwitch@gmail.com" on two occasions:  December 31, 2020,  and April 2, 2021.  Both of these dates matched the purchase history provided with the referral. PAYNE could not recall the method he used to pay for the purchases (credit card, CashApp, PayPal, etc.) or the carrier who delivered the items.  PAYNE stated that he purchased them to

4

"play around with his lower(s) and Glocks" and mentioned that he could never get them to work or fit properly.  PAYNE did not recall receiving any paperwork regarding filing an ATF Form 1 application.[1]  PAYNE told investigators that he did not have any of the parts at his residence, but stated that he had a storage unit (garage) approximately 35 minutes away where he worked on his firearms.  PAYNE stated he was not sure if he still had the MCDs.  PAYNE told investigators that he would check his storage unit for the MCDs.

10.     On that same day, PAYNE emailed an ATF investigator the above referenced purchase orders he had received via email.  The emails showed that on December 31, 2020 and April 22, 2021, PAYNE made purchases of "Lightning link fullauto AR-15," "Full Auto RDIAS Sear AR15," "Full auto glock switch," and "Full auto glock 17-41."  The invoices listed PAYNE's billing information as "Andrew Payne; 92 Sturgeon River Rd.; Glastonbury, CT 06033; United States (US); 8605088947; "andrewwpayne@gmail.com."  Additionally, the emails sent to the ATF investigator on March 20, 2024, that contained the purchase orders had the following email signature "Andrew W. Payne; Certified Financial Planner TM; Ph. 860-508-8947; Email. andrewwpayne@gmail.com."

11.     On March 22, 2023, attorney M.G. notified ATF investigators that five (5) of the devices (two "Glock Switches," two auto sears, and one "Lightning Link") had been located.  M.G. subsequently transferred the devices to investigators at the ATF Hartford Field Office.  On March 27, 2023, M.G. turned over two (2) additional "Lightning Links" to ATF investigators.

12.     PAYNE was not charged with any criminal violations, being that he was not otherwise prohibited from possessing firearms and was believed to have had turned over whatever devices he did have to the ATF investigators.  The seven (7) MCDs retrieved from PAYNE were

---

[1] ATF Form 1 is an application to make and register an NFA firearm.

destroyed by ATF in December 2023.  As described later in this affidavit, on March 19-20, 2024, "Glock Switches," auto-sears, and a "Lightning Link," the same type of MCDs PAYNE had been advised by ATF investigators were illegal to possess, were found in a storage/workshop space believed to be utilized by PAYNE in Tariffville, Connecticut.

### *Events of November 28-29, 2023*

13.     On November 29, 2023, at approximately 12:10 AM, Hartford Police Department ("HPD") officers responded to the Best Western Hotel located at 185 Brainard Road, Hartford, CT, for a firearm-related incident.  There, the complainant, an employee of the hotel whose identity is known to me, stated that an unattended firearm had been recovered from a hallway in the hotel. The complainant explained that an individual, identified as PAYNE, had checked into the hotel at approximately 11:00 PM on November 28, 2023.   Guests of the hotel had reported to the complainant that an individual was acting erratic, was seen crawling on the hallway floor and that a firearm was left unattended on the hallway floor.  The complainant had taken hold of the firearm for safety purposes prior to HPD arriving and subsequently turned it over to HPD.  The firearm was described as an FNH, model 509C, 9mm pistol bearing the serial number GKS0089256, with a threaded barrel.  The firearm did not contain ammunition.

14.     PAYNE, who had been detained as part of the investigation in the lobby area of the hotel by first arriving officers, was asked about his erratic behavior in the hallway.  PAYNE stated that he was walking and felt as if he was going to have a seizure.  He stated that he started to fall and began to crawl on the floor.  PAYNE stated that the firearm was not his and he did not know how it got on scene.

15.     HPD officers reviewed surveillance footage from the hotel, which showed an individual matching PAYNE's description acting erratic, crawling on the floor of the hallway.

According to the video footage, at approximately 12:04 AM, a firearm appeared to be present on the small of PAYNE's back.  The firearm then appeared to fall from his back to the floor.  PAYNE subsequently lifted the firearm with his hand, then dropped the firearm to the floor, leaving it unattended in the hallway.  HPD officers noted that other guests, including juveniles, were present in the hotel at the time of the incident.

16.     HPD officers conducted a sweep of the hotel room PAYNE was reported to be staying in, Room 104.  Based on their training and experience, HPD officers suspected that PAYNE was under the influence of a substance due to his behavior.  Based on their experience responding to drug-related overdoses and other drug-related crimes, HPD officers were concerned that someone else could have been in the hotel room experiencing some kind of drug-induced emergency.  Additionally, due to the recovery of the firearm, HPD officers were concerned that someone could have been injured inside the hotel room.  Ultimately, no other occupants were found within the hotel room.  HPD officers did find, in plain view, one (1) round of 9mm ammunition and a threaded Sig Sauer P320 barrel, as well as multiple used hypodermic needles. Because the needles were not safely capped, HPD disposed of the needles at the Hartford Hospital. Additionally, HPD observed in plain view PAYNE's Henderson-Johnson Clinic identification card.  HPD noted that the Henderson-Johnson Clinic is a clinic that treated individuals with opioid addiction.  I further know from open-source information that the Henderson-Johnson Clinic provides substance abuse and mental health treatment for adults and adolescents.

17.     PAYNE told officers that he stored his firearms in a storage unit in a building his uncle owned in Tariffville, Connecticut.  PAYNE stated to EMS personnel who had arrived at the Best Western hotel to evaluate him that he currently took Methadone.  I know from my training and experience that Methadone is used to treat those suffering from opioid addiction.

18.     PAYNE was subsequently arrested on state violations for breach of peace, negligent storage of a firearm, and illegal possession of an assault weapon.  He posted bond shortly following his arrest.  However, he has recently (on or about March 20, 2024) become the subject of a separate law enforcement investigation involving illegal firearms possession and manufacturing, described in part below.  As of the date of this affidavit, he remains in state custody on charges related to the separate investigation.

19.     HPD subsequently submitted the firearm information (from the firearm bearing serial number GKS0089256) to the National Tracing Center ("NTC") for firearm tracing.  With the given information, the NTC was able to trace the firearm to the original purchaser.  The NTC concluded that on May 14, 2020, PAYNE purchased the FNH 509C from Central Connecticut Arms, LLC in Portland, CT.  PAYNE's Connecticut Pistol Permit, which is required by the state in order to carry handguns and purchase firearms, listed the same FNH 509C as being registered to PAYNE with the same purchase date.  Further, I know based on my investigation that the firearm was manufactured outside the state of Connecticut, and thus traveled in interstate or foreign commerce before coming into PAYNE's possession.

20.     Based on my training and experience, I know that individuals who use drugs often act erratically, as PAYNE was found to have been doing while crawling on the hotel floor and claiming to have had a seizure.  Further, I know that people who use drugs often make statements that are not tied to reality, such as PAYNE's statement that the firearm—which had been on his person, purchased by him, and was registered to him—was not his, and that he did not know how it arrived on the scene.  Moreover, I know that prior to this incident, PAYNE held a successful job as a Senior Vice President at UBS Wealth Management, from which he was fired in 2023, at some point prior to the hotel incident.  According to open-source information, PAYNE at least presented

8

himself as an involved member of his community.  Based on my training and experience, the behavior displayed by PAYNE at the Best Western hotel on November 28-29, 2023, is especially unusual—and consistent with someone who is under the influence of drugs—as it is a sharp departure from his otherwise high-functioning employment history and community involvement. Finally, I know based on my training and experience that hypodermic needles are often used by drug users to inject product, and that this is a particularly common method when a user is abusing opioids.  PAYNE's bizarre behavior in the hotel, combined with the presence of apparently used hypodermic needles in a room to which he had checked into just hours before, lead me to conclude that at the time of his possession of the pistol seized that night, PAYNE was a drug user.

21.     As a result of PAYNE's arrest for the above events, he had agreed as part of his state court case to surrender his firearms to an authorized Federal Firearms License ("FFL") holder, and his state pistol permit was revoked.

### Target Telephone-2

22.     During the November 28-29 incident, police observed a mobile telephone on the bed of the hotel room PAYNE was staying in.  PAYNE requested multiple times that HPD officers provide him with his telephone for various reasons, for example, so that he could show the officers some pictures and to call his parents.  PAYNE also provided the phone number (959) 221-6821 (**Target Telephone-2**) to HPD as his contact number.

### Events of March 18-20, 2024

23.     On March 18, 2024, just before 9:00 p.m., the Simsbury Police Department ("Simsbury PD") received a 911 call from a resident of Mountain Road, Tariffville, Connecticut. In short, the complainant reported that a middle-aged white male knocked on his door asking for help, because "three men were chasing him," or words to that effect.  The man asked the

complainant if he could charge his phone in the caller's house, to which the caller refused and told the man to leave his property. The complainant described the man as a middle-aged white male, skinny, with blonde hair, approximately 5'9" in height, wearing black shoes, jeans, and a long sleeve dress shirt.

24.     Simsbury PD began searching the nearby neighborhoods and side streets, looking for the distressed man who may be experiencing some type of emergency. Less than a half mile away, police spoke with anonymous witnesses in the parking lot of 2 Tunxis Road, a multi-unit business complex. The witnesses said they viewed a man matching the above description moving bags of unknown contents in between the building and his white SUV.

25.     Parked near the rear of the facility, police found a white 2020 Maserati Levante GTS (an SUV) near a lower-level entrance to the building. The car was registered to Andrew PAYNE. DMV records showed that PAYNE had matching characteristics to the description provided by the complainant from Mountain Road. The Maserati was unoccupied.

26.     Simsbury PD, who were familiar with this area and this business complex, understood that although some entrances to the complex remained open and allowed for unrestricted access to the building, the individual businesses within the complex were closed at this hour of the night. Below is an image of 2 Tunxis Road, as viewed looking northeast from the street:



27.     Police entered the rear door on the far east end of the premises, which led to a

basement-level hallway where numerous office doors for various businesses were visible on both sides of the hallway.  In order to see where the distressed man may have fled and concerned that he have been experiencing some type of emergency, police began to check closed doors to see if they were locked or unlocked.  Almost immediately upon beginning these efforts, Simsbury PD located an unlocked door to "Unit #23."  The door opened to a dark room, which an officer illuminated with his flashlight.  The officer who inspected the room is a member of the North Central Emergency Services Team ("SWAT" team), is a firearms instructor and armorer, and has extensive experience with firearms handling.  Immediately upon seeing the interior of Unit #23, the officer identified a stock of an AR-15-style weapon on the ground in front of him.  While continuing to search the space for the distressed man, officers saw in plain view numerous firearms, firearms parts, firearms accessories, ammunition, and magazines.  There were also logos of firearms companies printed or painted on the wall of the unit.

28.     Because the unsecured room contained numerous firearms, including a suspected fully-assembled AK-47, but did not contain the distressed male, law enforcement exited Unit #23 but remained nearby to secure entry to the space.

29.     Other members of Simsbury PD were searching the upper level of the building for the man in distress.  While searching the upper level, the door to Unit #209 opened and a man appeared.  The man identified himself as Andrew PAYNE.  As officers spoke with PAYNE, they observed that he had bloodshot eyes and was wearing only one shoe.  His other foot was bare and covered in dirt and numerous scratches.  Officers observed that his hands were similarly covered in dirt and had small scratches.  His jeans were also covered in dirt near the knees and shins.  Based on PAYNE's appearance, which both matched the individual the complainant described and matched someone who appeared to have run or fallen through yards or wooded areas, in addition

to the distance between the residence of the Mountain Road complainant (less than half a mile, easily traversed by foot) and the business complex, officers concluded that PAYNE was likely the man who had knocked on the door of the Mountain Road home and claimed to have been chased by three men.    However, when asked about this, PAYNE was uncooperative and denied his involvement.

30.    Officers then remained at the entrances of both Unit #209 and Unit #24, as well as near the Maserati, until they could obtain search warrants.  PAYNE confirmed to officers that he was renting the office space, but that he did not have a key to the space and that his attorney, an individual with initials M.G., was the person who was actually in "control" of the space.  Officers informed PAYNE that Unit #23 was currently unlocked and could have been accessed by anyone in the building.  When officers asked PAYNE who owned the guns in Unit #23, he replied "I do." He further stated that the room should be locked and that he did not unlock it.  Meanwhile, officers contacted the owner of 2 Tunxis Road and confirmed that PAYNE was leasing both Unit #209 and Unit #23.  The owner also stated that he believed PAYNE might be sleeping in Unit #209.  PAYNE told officers that Unit #209 contained a BB gun pistol.  It was discovered later in the course of the investigation that the owner of the building was believed to be PAYNE's uncle.

31.    Officers contacted PAYNE's aforementioned attorney, M.G., who stated that PAYNE had been previously arrested in Hartford, Connecticut (the November 28-29 incident) and that a condition of his release was to relinquish all firearms.  Officers confirmed through NCIC that any possession of firearms by PAYNE would be a violation of his release conditions, and further confirmed that his pistol permit was currently listed as revoked.  M.G. explained that PAYNE's father had previous transferred all of PAYNE's firearms to an FFL in Watertown, Connecticut on or about January 10, 2024.  M.G. further explained that although the lease to Unit

#23 was in PAYNE's name, M.G. had been subletting the back room of the unit and the back room had been secured with a pad lock.  However, M.G. stated that he had not been in the office space for "a couple months," and that it was secured "when he last saw it," or words to that effect.  M.G. also stated that PAYNE's father had changed the locks to the main door of Unit #23 so that PAYNE could not enter it.  M.G. indicated that there may be firearms components in the main area of Unit #23, but that to his knowledge, there were no fully assembled firearms.  It should be noted that the back room was not secured shut with any type of padlock when Simsbury PD initially entered the space.

32.     Below are images of Unit #23, as viewed by police officers who conducted a state-authorized search:

a.     Showing an apparent workspace in the "main" area with various firearms components and machinery, described in further detail herein:





b.  Showing a door from within the "back room" leading into the "main room" as

well as "300 BLACKOUT" (a caliber of rifle ammunition) painted on wall:



c.   Showing a "Sig" firearms brand logo painted on a wall in the "back room":



33.     While on scene, officers also contacted PAYNE's father, W.P.  W.P. confirmed what M.G. had said, in that Units 209 and 23 were leased by PAYNE, but that he was not allowed to access the spaces because of his release conditions.  W.P. also said that the room should have been locked, and that the front room should only have weapons parts but not assembled weapons. W.P. stated that PAYNE "had access to the front of the room, not the back room, that's the way it is right now," that "at the moment, he has a key," but that "he hasn't had one until a couple of days ago."  Based on these statements from M.G. and W.P., police surmised that PAYNE did indeed have access to Unit #23 and the items inside.  Further, police had the complainant drive by the area while PAYNE was standing outside.  The complainant confirmed that he was "pretty sure" PAYNE was the person at his door.

34.     At 11:02 p.m., officers arrested PAYNE for a violation of his release conditions. However, shortly after, he was ordered to be released pending execution of the search warrants and outcome of further investigation.

35.     On the morning of March 19, 2024, law enforcement executed search warrants on

Units #209 and #23, as well as PAYNE's white Maserati SUV.  Within PAYNE's vehicle, law enforcement recovered glassine envelopes containing suspected fentanyl, as well as empty glassine envelopes and used hypodermic needles.  Law enforcement suspected, based on their training and experience, that the glassine envelopes contained fentanyl because of their packaging, which included "branding" and being packaged in "bundles," which is consistent with fentanyl packaging.  Within Unit #209, law enforcement discovered additional empty glassine envelopes and used hypodermic needles.  Within Unit #23, law enforcement recovered what were suspected to be fully automatic machine gun parts, assembled machine guns, assembled firearms (rifles, shotguns, and pistols), and numerous firearm components (upper receivers, barrels, magazines, handgun slides, shoulder stocks, etc.), which I know from my training and experience are often possessed by those who manufacture privately made firearms ("PMFs"), commonly referred to as "ghost guns," which bear no serial number.  Also recovered were serialized and unserialized suppressors and suppressor parts, items regulated under the NFA.  Several firearms with serial numbers were also seized from Unit #23.  Used hypodermic needles were also observed within Unit #23.

36.     One of the AR-style lower receivers recovered from Unit #23 had "On Spread Sheet" written on a piece of tape.  Additionally, an invoice for one of the firearms registered to PAYNE, a Sig Sauer Fire Control Unit bearing serial number FCU350757 was found within Unit #23.  The invoice, dated April 13, 2022, listed PAYNE as the purchaser, along with the email address andrewwpayne@gmail.com and the telephone number "(860) 508-8947."

37.     Law enforcement also observed various pieces of equipment that indicated the space was used to manufacture firearms, such as Computer Numeral Control ("CNC") milling machines, manual milling machines, firearm milling jigs, and various other power and hand-tools.

Firearm parts needed to "build out" firearms were also found.  Neither PAYNE, M.G., nor W.P. have a license to manufacture firearms regulated under the NFA.  The types of NFA firearms for which a license is required to manufacture includes firearms like those found during the search of Unit #23, including suspected short barrel rifles/shotguns, suppressors, as well as firearms that appeared to have been designed or altered to fit illegal MCDs or had been converted to function as machineguns.

38.     On the morning of March 20, 2024, I met with an employee of P&G Firearms LLC in Watertown, Connecticut.  P&G Firearms LLC is an FFL, i.e., a gun store, licensed to conduct transfers of firearms.  The employee stated that on January 10, 2024, W.P. transferred thirty (30) firearms that were registered to PAYNE to the FFL.  The employee noted that none of the firearms were complete firearms, that they were all what are known as lower receivers or frames (the part of the firearm that under federal definition is a firearm) without barrels, slides or upper receivers. I was provided with the transfer paperwork for these firearms.  After cross-referencing the firearms on PAYNE's Connecticut Pistol Permit with the transferred firearms, it was found that approximately nine (9) firearms registered to PAYNE had not been transferred.  Of those nine firearms, approximately six (6) were recovered from Unit #23.  The remaining three (3) firearms from PAYNE's Connecticut Pistol Permit are currently unaccounted for.  Law enforcement also recovered three (3) additional firearms from Unit #23 that were not listed on PAYNE's Connecticut Pistol Permit, but did appear to have been purchased by PAYNE on March 22, 2023 at an FFL in Portland, Connecticut.  Furthermore, approximately five (5) firearms recovered from Unit #23 were not registered to PAYNE.  The circumstances in which PAYNE came to have access to those five firearms is currently unknown.  These findings were inconsistent with the information provided by M.G. and W.P. about PAYNE having surrendered all of his firearms in January.

39.     Below are images of portions of the firearms, firearm components, and ammunition collected during the March 19, 2024 search of the space to which PAYNE had access, Unit #23.







40.     In the evening of March 20, 2024, Simsbury PD executed a second search warrant at 2 Tunxis Road, Unit #23, in order to seize firearm-related manufacturing equipment, documents, electronics, and any other firearm-related items.  Of note, a "Lightning Link," AR auto sear, and "Glock Switch" pieces were recovered.  These were specifically the type of items PAYNE was told to turn over to the ATF on March 20, 2023.

41.     While investigators were on scene at 2 Tunxis Road, it was discovered that PAYNE's white Maserati SUV had driven up to the area.  Simsbury PD searched the area for PAYNE.  When PAYNE saw officers approaching him in the second-floor hallway near Unit #209, he attempted to leave the area.  Officers attempted to stop PAYNE and in the process, observed a knife in his hand.  PAYNE was brought to the ground, restrained, and placed into handcuffs.  PAYNE appeared to be in an erratic state during this incident.

42.      Target Telephone-1 was seized from PAYNE's person during his arrest and remains in the custody of the Simsbury Police Department.

43.     Based on my preliminary review of what was recently seized from the Unit #23 search, I believe that it is likely that PAYNE continued to possess the types of firearms that he agreed to turn over to ATF in March 2023.  Further, by not turning in all of his registered firearms and by maintaining access to a space with the quantity of firearms and equipment to manufacture more, he appeared to be in flagrant violation of the conditions of his release from his November 2023 arrest by HPD.  My review of the firearms seized from Unit #23, in various stages of completion, as well as the firearms parts, leads me to believe that PAYNE was not only manufacturing firearms, but specifically firearms regulated under the NFA.

44.     The events of March 18-20, 2024, mark a second instance within four months that PAYNE had displayed bizarre and erratic behavior while having apparent access to firearms.

Moreover, PAYNE should have known that, based on his interactions with ATF in March 2023 and with HPD in November 2023, he had been specifically informed he had to relinquish his custody over either certain types of firearms (machinegun conversion devices based on his March 2023 interactions with ATF) or all firearms (based on his November arrest by HPD).

45.     Further, in the course of my investigation, I spoke with PAYNE's estranged wife, E.P.  She currently resides at the couple's former shared home in Glastonbury, CT, which is now up for sale.  E.P. indicated it was difficult to say when exactly she became aware of PAYNE's drug use, but that she had had suspicions for a while.  Going back at least 1-2 years, E.P. indicated that she had more concrete examples of his drug use (Post-It-Notes rolled into straws, full and empty suspected fentanyl baggies, needles[2]).  E.P. stated that after PAYNE's November 2023 arrest, she had attempted to obtain a Risk Protection Order ("RPO") against PAYNE.  RPOs are court orders that prevent a person who is deemed a risk to themselves or others from having access to firearms and/or ammunition.  E.P. stated that the RPO was denied, in part due to PAYNE's parents, as well as M.G., stating that PAYNE did not have access to firearms.

46.     E.P. told investigators that when their child was born in 2021, PAYNE moved his firearms out of the residence.  She stated that PAYNE got a storage unit in a building in Tariffville, CT that PAYNE's uncle owned and moved the firearms there.  She described the building as a "business building mill" along the river.   I know from my investigation that this description appears consistent with 2 Tunxis Road, Tariffville, CT.

47.     On February 14, 2024, E.P. had reported to Glastonbury Police Department that she had found drug paraphernalia while cleaning out her residence in preparation for selling the home.  In a room primarily used by PAYNE, multiple empty glassine bags were found.

---

[2] PAYNE's wife did state that PAYNE was undergoing testosterone replacement therapy and would use needles to inject testosterone, but she believed he was possibly using the needles to inject illicit drugs as well.

48.     E.P. also stated that PAYNE had suspicious spending transactions via CashApp that she believed to be drug related.  CashApp is a mobile payment application in which users, via a mobile device, engage in peer-to-peer money transfers.  User accounts are associated with specific telephone numbers.  E.P. showed investigators on her telephone what appeared to be some kind of credit card/banking statement.  The statement showed CashApp transactions between October 15, 2023 and November 7, 2023.  E.P. was suspicious of the transactions based on the amount of money being transferred and the names of the individuals the CashApp transactions occurred with.  The statement E.P. showed investigators showed multiple transactions with an individual known in full to me but described here as "Individual-1."  Transactions between PAYNE and Individual-1 included November 2, 2023 for $530.45, November 4, 2023 for $350.20, and two different transactions on November 7, 2023 for $350.20 each.  During the same time period (October 15 through November 7, 2023), PAYNE also had two $721 and one $515 CashApp transactions with an individual ("Individual-2") who I learned through open-source information works as a Certified Nursing Assistant at a rehabilitation facility, which I know from my training and experience is a facility that would have access to controlled substances which could be diverted for illegal use.  Based on my training and experience, I know that criminals often utilize cell phone applications like CashApp to conduct illicit transactions, whether it be related to drugs or guns.  My investigation into PAYNE's CashApp activity is pending.

49.     A query of CashApp for Individual-1's name revealed two accounts associated with that name.  One of the accounts ("Account-1") had an associated profile picture.  A query of Connecticut Department of Motor Vehicle (DMV) records revealed Individual-1's DMV photograph, which appeared to match the individual in the CashApp profile picture.  A review of Individual-1's criminal history and open-source articles showed that in he was convicted of

shooting an individual in Hartford, CT, in 2011.  His criminal record also revealed felony convictions in Connecticut for Escape-1, Larceny-3, two Violations of a Protective Order, and multiple misdemeanor convictions for Assault and Threatening, spanning from 2019 to 2021.

### Target Telephone-1

50.     When I interviewed E.P., she provided two telephone numbers for PAYNE, (860) 508-8947 (**Target Telephone-1**) and (959) 221-6821 (**Target Telephone-2**).  She stated that PAYNE started using **Target Telephone-2** sometime in the fall and was not responding to calls to **Target Telephone-1**.  A query of both telephone numbers revealed that the **Target Telephone-2** number was associated with the CashApp account "DrewWwind" with the handle "$majpayne99," which I believe to be used by PAYNE.

51.     A phone seized from PAYNE on the date of his March 20, 2024 arrest, is believed to be **Target Telephone-1**.

### Toll Analysis

52.     On March 28, 2024, I received toll and subscriber records from Verizon Wireless for **Target Telephone-2**.  As of October 24, 2023, PAYNE was listed as the subscriber for the number.  Additionally, billing statements, as recent as February 29, 2024, showed PAYNE being actively billed for two iPhone 15s, which were the **Target Telephones**.

53.     An analysis of the toll records for **Target Telephone-2** showed that a number believed to be utilized by Individual-1 is one of PAYNE's top callers.  Between November 8, 2023 and March 25, 2024, PAYNE and Individual-1 had 571 calls, texts, attempted calls and voicemail (counting both inbound and outbound).

54.     An analysis of the toll records for the -6821 number also showed that regular inbound and outbound calls since October 2023 between the -6821 number and a phone number,

based on open-source queries, belonging to the Henderson Johnson Clinic occurred, which I know from my training and experience may indicate continued treatment for drug use.

55.     On April 2, 2024, I received toll and subscriber records from Verizon Wireless for **Target Telephone-1**.   The records showed that PAYNE was listed as the subscriber of the telephone number, possibly as far back as 2013.   While this number was not recently in use as frequently as **Target Telephone-2**, the records showed **Target Telephone-1** had been used as recently as February 16, 2024 to send an MMS message, and had received calls and messages in the days leading up to the March 18, 2024 incident in Tariffville, CT.

56.     Toll records also showed that **Target Telephone-2** had been used to make phone calls after the date of PAYNE's arrest.   Both of the Target Telephones are believed to be the same, or similar, model of iPhone.   However, the outgoing toll activity on **Target Telephone-2** which post-dates PAYNE's state arrest s leads me to believe that **Target Telephone-2** is not in the custody of the DOC.

### *Connecticut Department of Corrections*

57.     One April 1, 2024, I was informed by an intelligence officer with the Connecticut Department of Corrections ("DOC") that they had been monitoring phone calls and messages sent and received by an inmate believed to be PAYNE.   Phone calls and messages, unless privileged, are recorded, and can be monitored by DOC personnel.   Inmates are provided proper notification that the contents of the phone calls and messages are recorded.   A summary of some of these phone calls are listed below:

     a.   On March 26, 2024, PAYNE placed a call to a phone number ending in -2619.   A query of this phone number through open-source databases revealed that the number likely belonged to PAYNE's father, W.P.   PAYNE told W.P. that there was

a password application on his phone that had everything in it.  W.P. told PAYNE

that he had the phone with him, but he needed a password to access it.

b. On March 27, 2024, PAYNE told W.P. something to the effect of "Keep the 959

[**Target Telephone-2**] number and ditch the other one…Yeah, the new one."

c. During a different call later on March 27, 2024, W.P. tells PAYNE something to

the effect of "I'll look at the phone and like I did your new phone— I went down

through all the voicemails, everything and [U/I] I'll do that on the old phone. So,

I'll probably cancel the old phone. Your new phone, I'll give you the minimum

service."

d. During a different call later on March 27, 2024, PAYNE tells W.P.  something to

the effect of "Just block the drug dealers that call me," to which W.P. responds

"Yeah, no kidding."

e. During a different call later on March 27, 2024, PAYNE tells W.P.  something to

the effect of "I can't even tell you what I've been doing this last year, I couldn't.  I

don't even know.  All I know is I was falling asleep in client meetings, falling asleep

on the phones, falling asleep talking to you and mom.  Jumping out of windows,

running around places with full automatic weapons."

58.     Based on the conversations between PAYNE and W.P., it is believed that **Target

Telephone-1** is PAYNE's "old phone" and is associated with the telephone number (860) 508-

8947.  It is also believed that **Target Telephone-2** is currently in the possession of W.P. and is

associated with the telephone number (959) 221-6821.

59.     Based on the foregoing, there is probable cause to believe, and I do believe,

PAYNE engaged in unlawful activities, specifically unlawful firearm/ammunition possession by

a drug user and illegal manufacturing of NFA regulated firearms, and that Target Telephone-1 and Target Phone-2 will contain evidence of the Target Offenses.

60.     From my training and experience, I know that individuals involved in firearms manufacturing utilize mobile devices like the **Target Telephones** for a multitude of purposes. Mobile devices are often utilized to research firearm manufacturing methods and techniques via the internet.  Mobile devices are used to purchase firearms, firearm parts, firearm accessories, ammunition, and machines and tools related to firearms manufacturing from both legitimate and illegitimate sources.  Mobile devices are utilized to track purchases via email, text message, and package tracking websites or applications.  Furthermore, I know that mobile devices are used to take photographs and record videos of firearms, whether for personal use or in order to facilitate firearms manufacturing and trafficking.  I also know that drug users photograph and record video of themselves and others utilizing the controlled substances, as well as document the product they have purchased.  Such photographs and videos will frequently be stored on the mobile devices and/or sent to and from respective devices.

61.     From my training and experience, I know that individuals involved in illicit activities, like illegal drug use and illegal firearms manufacturing, will operate more that one mobile device in order to hide and protect their criminal activities.

62.     From my training and experience, illicit drug users and illegal firearm manufacturers utilize mobile devices to arrange transactions involving controlled substances and firearms.  Not only are the various telephone-related features and applications, such as messenger and text messaging, used to contact drug and firearms sources and customers, mobile device applications such as CashApp, Venmo, PayPal, etc., are used to send and receive payment for said controlled substances and firearms and firearm-related items.  I also know that drug users will

utilize mobile devices to contact drug treatment facilities and to document possible drug treatment. Drug users and illegal firearm manufacturers will also utilize their phones' GPS or location services to arrange meetings, to find meet locations for the purpose of conduct firearm and narcotic transactions, and to navigate over long distances in furtherance of their activities.

63.     I also know that mobile devices contain applications that can be utilized to maintain notes, ledgers, and spreadsheets.  Drug users will maintain accounts of money owed and spent to drug dealers.  Firearm manufacturers will maintain logs and records of purchases, firearms manufactured, and transactions conducted with other individuals.

64.     From my training and experience, I know that telephone users will often upgrade or change mobile device models or types.  These device users have the ability to transfer a telephone number from one device to another.  Similarly, users can transfer or "sync" their data from one device to another, typically through cloud-based accounts like Apple's iCloud.  I know that just because an individual has a newer or different device, it does not mean that data from previous devices cannot be stored on this newer device.

65.     Indeed, during ATF's March 2023 meeting with PAYNE and his attorney, PAYNE was able to retrieve receipts from firearms purchases made in 2020 and 2021, believed to have been displayed on **Target Telephone-1**.  Based on my training and experience, there is probable cause to believe and I do believe that there will be evidence of PAYNE's firearms and firearms components transactions, as well as drug use, from as far back as **December 2020 to present for both of the Target Telephones**.  Based on my training experience, the DOC phone calls between W.P. and PAYNE indicate that the PAYNE was attempting to explain how his father may be able to merge or otherwise manipulate the data across both phones.  Based on the above description of

27

being able to "sync" phones, I believe that the same search time frame will be applicable to both of the **Target Telephones**.

66.      Accordingly, I believe that **Target Telephone-1**, seized from PAYNE by the Simsbury Police Department on March 20, 2024, will contain evidence of the Target Offenses.  I also believe that **Target Telephone-2**, believed to be in the possession of W.P., will also contain evidence of the Target Offenses.

**Information Regarding Cellular Telephones and the Requested Search Warrant**

67.      Based on my training and experience, as well as information asserted herein, there is probable cause to believe, and I do believe, that within the **Target Telephones** there will be found items which constitute evidence of the crimes of the Target Offenses.

68.      Based on my training, experience, I also know that the **Target Telephones** may have some or all the capabilities that allow each phone to serve as a wireless telephone, digital camera and video recorder, portable media player, global positioning system (GPS) navigation device, a hand-held radio, and a personal digital assistant (PDA). In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, as well as evidence relating to any potential co-conspirators with whom the device was in contact.

69.      With regards to the **Target Telephones**, I request permission to search the **Target Telephones** for evidence relating to the Target Offenses by forensic means and/or physical review. Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including devices used by those involved in the manufacturing of illegal firearms and use of illicit narcotics:

a.   the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

b.   the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

c.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

d.   any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.   any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.   GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.   saved searches, locations, and route history in the memory of said devices;

h.   internet browsing history, to include, internet searches in the memory of said device; and

i.   images and videos in the memory of said device.

70.    It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise

reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the execution of a search warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory to preserve the data therein from being corrupted.

71.     It is also requested that the warrant be deemed executed once the items listed in Attachment A have been submitted for extraction, but not complete until extractions are made from the respective phone and that further analysis of the seized items be permitted at any time thereafter.

72.     It is also requested that stored electronic information, data, information, and images contained in the **Target Telephones** may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS OF
## THE TARGET TELEPHONES

73.     The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

74.     As described above and in Attachment B, the undersigned Affiant seeks permission to search and seize evidence that the **Target Telephones** might contain, in whatever form they are stored.  Based on my knowledge, training, and experience, I know that electronic devices can store

information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

75.     Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.  These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B or perusing all stored information briefly to determine whether it falls within the scope of the warrant. Considering these difficulties, ATF or another law enforcement agency, intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## **CONCLUSION**

76.     I submit that this affidavit supports probable cause for warrant to search the **Target Telephones,** for the time frame of December 1, 2020, to present, as described herein and in Attachment A, and to search the **Target Telephones** for evidence of the Target Offenses as described in Attachment B.

NATHANIEL MAY

Digitally signed by NATHANIEL MAY
Date: 2024.04.05 15:56:49 -04'00'

_____

Nathaniel May
Special Agent, ATF


The truth of the foregoing affidavit has been attested to me via telephonic attestation by

Special Agent Nathaniel May on this 5th day of April, 2024, at New Haven, Connecticut.

Maria E. Garcia

Digitally signed by Maria E. Garcia
Date: 2024.04.05 16:30:37 -04'00'

_____

HONORABLE MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

32

## ATTACHMENT A-1

**Property to Be Searched**

The cellular telephone (referred to as "**Target Telephone-1**"), described as follows:

- o   One iPhone in a clear phone case, believed to be associated with the telephone

    number (860) 508-8947, currently in the custody of the Simsbury Police

    Department in Simsbury, CT.

**ATTACHMENT B-1**

**Particular Things to be Seized**

1.      All records presently on **Target Telephone-1** (description in Attachment A-1 incorporated herein), and all deleted records which are able to be recovered from **Target Telephone-1** as they related to violations of federal law, specifically violation of 18 U.S.C. § 922(g)(3) (unlawful possession of firearms and ammunition by user of a controlled substance) and 26 U.S.C. § 5861(f) (illegal manufacturing of National Firearms Act regulated firearms), by Andrew PAYNE and others, for the time span of December 1, 2020 until present, including:

   a.  the telephone number, ESN number, serial number, and SIM card number;

   b.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory;

   c.  descriptions of time, date, locations, items, or events showing the commission of, or connecting a person to, the above-described crimes;

   d.  all records, however created or stored, which demonstrate ownership and use of the device;

   e.  all records providing identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the device;

   f.  any evidence showing the identity of the maker or user of the data and information contained in the device, such as passwords, sign-on codes, and program design;

   g.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

   h.  saved searches, locations, and route history in the memory of said devices;

      i.   internet browsing history, to include, internet searches in the memory of said device; and

      j.   images and videos in the memory of said device;

2.     It is specifically authorized that stored electronic information, data, information and images seized may be reproduced by printing, converting, or copying into storage in another device.

3.     It is specifically authorized that the warrant will be deemed executed once the seized items are extracted or copied from the phone and that further analysis of the seized items extracted or copied from the phone is permitted at any time thereafter.

## ATTACHMENT A-2

**Property to Be Searched**

The cellular telephone (referred to as "**Target Telephone-2**") is described as follows:

- o   One suspected iPhone, believed be associated with the phone number (959) 221-

    6821, believed to be in the possession of PAYNE's father, W.P.

## ATTACHMENT B-2

### Particular Things to be Seized

1. All records presently on **Target Telephone-2** (description in Attachment A-2 incorporated herein), and all deleted records which are able to be recovered from **Target Telephone-2** as they related to violations of federal law, specifically violation of 18 U.S.C. § 922(g)(3) (unlawful possession of firearms and ammunition by user of a controlled substance) and 26 U.S.C. § 5861(f) (illegal manufacturing of National Firearms Act regulated firearms), by Andrew PAYNE and others, for the time span of December 1, 2020 until present including:

   a. the telephone number, ESN number, serial number, and SIM card number;

   b. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory;

   c. descriptions of time, date, locations, items, or events showing the commission of, or connecting a person to, the above-described crimes;

   d. all records, however created or stored, which demonstrate ownership and use of the device;

   e. all records providing identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the device;

   f. any evidence showing the identity of the maker or user of the data and information contained in the device, such as passwords, sign-on codes, and program design;

   g. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

   h. saved searches, locations, and route history in the memory of said devices;

i.  internet browsing history, to include, internet searches in the memory of said device; and

j.  images and videos in the memory of said device;

2.  It is specifically authorized that stored electronic information, data, information and images seized may be reproduced by printing, converting, or coping into storage in another device.

3.  It is specifically authorized that the warrant will be deemed executed once the seized items are extracted or copied from the phone and that further analysis of the seized items extracted or copied from the phone is permitted at any time thereafter.